# Geoffrey P. Alpert

1900 Heyward St. Columbia, South Carolina 29205 USA
Telephone:  (803) 446-4139 ☎ Fax:  (803) 777-7319

September 29, 2015

REPORT

RE:  Pavlov v PBSO

I, Geoffrey P. Alpert, declare that the following statements reflect objective truth as extracted from records provided to me by Leslie M. Kroeger or represent my expert opinion, to the highest degree of professional certainty.  If called to testify in this matter, I will express the opinions contained in this report unless provided with materials that modify or change my opinions.

       I have a Ph.D. in Sociology from Washington State University and have been conducting research on police and law enforcement agencies for the past twenty years.  I have been awarded federal, state and local grants to investigate various aspects of police work. I have been awarded several international fellowships to investigate police activities and I have been asked by numerous police agencies to write policies for them, conduct training and to consult with them on various issues. I have written more than 150 publications on criminal justice, many of which deal with police policies, customs and practices. I have written peer-reviewed articles dealing specifically with the use of force, Conducted Electronic Weapons and deadly force. I am familiar with police operating procedures as well as the customs developed by practice. I am a member of the International Association Chiefs of Police Research Advisory Council.  My current position is Professor of Criminology and Criminal Justice at the University of South Carolina and I have served as a member of the South Carolina Law Enforcement Training Advisory Council. I also have an appointment at the Centre for Excellence in Policing and Security at Griffith University in Brisbane. I have been conducting research on police use of force since 1985 and have interviewed officers and suspects and evaluated thousands of official police use-of-force and emergency driving records over the years.  In reaching the opinions I hold in this case, I relied upon and applied these same principles derived from the peer-reviewed research and the same principles and methods by which I analyze police practices for law enforcement in non-litigation related matters.  The principles forming the basis of my opinions are well recognized and widely accepted within the field of criminology.  My opinions are based on my research, experience and education.  I have attached a copy of my curriculum vitae.

**Documents Reviewed:**

911 Call Transcript
911 Call Audio File
CAD Report 1
CAD Report 2
Cercy Walk Through Transcript

Rosenthal Walk Through Transcript
Crime Scene Notes
Crime Scene Reports
Crime Scene Photos
Critical Incident Review
Death Certificate
Firearms Case File
FOIA Documents for CI 14003-45891
Jennifer Cohen Statement Transcript
Jason Kessler Statement Transcript
Jean Pavlov Statement Transcript
Jeanette Llera Statement Transcript (1 & 2)
Medical Examiner Amended Report
FOIA Documents for PBSO Investigation File
Radio R1, R2, R3 Transcripts
Radio R1, R2, R3 Audio Files
Offense Report
General Order 500.00 – Use of Force
General Order 500.01 – Non-Lethal Use of Force
Video Recording of Walk Through
Deputy Evan Rosenthal deposition transcript and video
Deputy Ronald Cercy deposition transcript and video
Deputy Evan Rosenthal's IA File
Deputy Rosenthal's Disciplinary File

**Facts**:

On April 2, 2014, a call was received by a 911 operator from an obviously confused person, later identified as Matthew Pollow.  Mr. Pollow was requesting help but was having a difficult time telling the operator where he was located.  He told the operator a group of adults was after him and he was asked if he had been drinking or had taken drugs.  His contradictory answers should have provided the operator with sufficient information to raise a concern about Mr. Pollow's health and/or mental health.  Matthew denied that he had been drinking, and when he was first asked if he had been on drugs, Matthew said that he had been on drugs, only to state that he didn't know if he had been on drugs when asked the same question immediately after.  He was then asked once again, seconds later, if he was not sure if he had been on drugs, and Matthew responded "No." He was asked if he had a weapon and told the operator he had a small pocket knife.  The call went out as a man with a pocket knife that had people chasing him, and was unsure if he had taken drugs or alcohol that day.  During the call, Matthew asked for help at least 3 times.

Deputies Rosenthal and Cercy arrived at one of several areas the 911 operator thought the problem was located.  When they pulled into the apartment complex (Tuscany Pointe), they weren't sure it was the correct location.  Deputy Rosenthal arrived first, was followed by a civilian SUV, with

Deputy Cercy behind the SUV.  Deputy Rosenthal was looking around expecting someone to approach him while Deputy Cercy drove past his location.  Deputy Rosenthal saw a man standing between two cars with whom he made eye contact.  He testified in his deposition that the man was standing next to a car door. (Deposition, P. 159-160, 163)

Mr. Pollow jogged over to Deputy Rosenthal's passenger door window with his hands in his pockets and seemed nervous.  Deputy Rosenthal asked the man to come over and take his hands out of his pockets.  Mr. Pollow did come to the deputy, but kept his hands in his pockets.  As Deputy Rosenthal said during his walk-through, "…this guy is not cooperating," and "… something didn't look right." He testified, it "made me nervous." (Deposition, P. 171)

While in his car, Deputy Rosenthal un-holstered his gun and pointed it at Mr. Pollow. He testified he pointed his gun out the passenger side window, "… because I didn't know who was running toward my car at this time.  It was a dark area." (Deposition, P. 164)  Deputy Rosenthal testified he got out of his car and pointed his gun over the roof of the car at Mr. Pollow, who was approximately 5 feet away. (Deposition, P. 169), and he said something to the effect of calm down, what's going on (Deposition, P. 165)  He testified that Mr. Pollow looked sweaty, had dilated eyes, and was disheveled (Deposition, P. 165), but did not have anything in his hands. (Deposition, P. 169)

Deputy Rosenthal ordered Mr. Pollow to go to the front of the car – as it was his stated intention to pat him down for weapons.  Deputy Rosenthal then asked Mr. Pollow to empty his pockets as he was standing near the hood of the police car on the passenger's side.  Mr. Pollow put his hands in his pockets and started to pull things out of his pockets. (Deposition, P. 179)  The objects included what looked like a knife or screwdriver among other things.  Deputy Rosenthal asked Mr. Pollow to put his hands on the hood so he could pat him down for weapons. Rather than follow his orders, Mr. Pollow grabbed what Deputy Rosenthal thought was a knife, but ended up being a screwdriver. Deputy Rosenthal ordered him to drop it, but Mr. Pollow came around the car toward Deputy Rosenthal who backed up and stated that Mr. Pollow said something like, "come get me," or, "I'm going to get you."  Mr. Pollow kept coming toward Deputy Rosenthal who was retreating and telling him to drop it.

Deputy Rosenthal testified he thought he backed up around the trunk of the car (Deposition, P. 194) and as Mr. Pollow closed the gap to about 5 or 6 feet between him and Deputy Rosenthal, with the screwdriver raised above his head, the deputy fired his weapon 5 times.  In the walk-through video, Deputy Rosenthal stated, "At that point I couldn't back up. I didn't know what was behind me and I had given him – you know – an opportunity to drop it, and he just wouldn't stop.  Deputy Rosenthal testified in his deposition, "I gave him 15 warnings to that point, and I retreated a long ways. I've done what I could do at that point …without jeopardizing my own life." (Deposition, P. 212). During his walk-through video, Deputy Rosenthal showed how Mr. Pollow was approaching him and closing the gap, raising the screwdriver, and threatening him until he had nowhere else to retreat, was in fear of his life, and shot several times.  Deputy Rosenthal also showed how Mr. Pollow displayed the screwdriver over his head during his video-taped deposition.

After being shot, Mr. Pollow fell to the ground.  Deputy Cercy came over and had to physically kick

3

the screwdriver out of Mr. Pollow's hand, because Mr. Pollow was still "clinching it" in his right hand (Deposition P. 220) and began CPR. Deputy Rosenthal estimated the shooting occurred approximately 20 seconds after Mr. Pollow had approached his police car.

The autopsy report shows Mr. Pollow was hit with four bullets, including a superficial wound in his mid-back, and three penetrating wounds (in no certain order of firing). The first penetrating wound was in the upper back, back to front, left to right, and upward. The second penetrating wound was in the lower back, back to front, upward, and slightly to the left. The third penetrating wound was in the neck, left to right, downward, and front to back.

While several witnesses, including Mr. Pollow's mother (Jean Pavlov), Liera, Cohen and Kessler, were close by, none saw the shooting.

**Opinions and Conclusions**

1.    If Mr. Pavlov did not threaten Deputy Rosenthal by raising the screw driver in close proximity, then the use of deadly force is neither reasonable nor justified as there was no objectively reasonable fear of death or serious bodily harm.

2.    Based on the deposition transcript testimony of Deputy Cercy, as well as the video deposition, during which he displayed the position of Mr. Pollow's hands and arms (never above his chest) during this incident, and never in a threatening manner, Deputy Rosenthal's use of deadly force was not reasonable or justified. According to this evidence, Mr. Pollow did not threaten Deputy Rosenthal by raising a screwdriver over his head while in close proximity, and was not an imminent threat to Deputy Rosenthal.

3.    The testimony of Deputy Cercy, who was within feet of the incident, indicates that Mr. Pollow was simply closing the gap as he was approaching Deputy Rosenthal, and not threatening Deputy Rosenthal. Therefore, Mr. Pollow was not an imminent threat to Deputy Rosenthal and the use of deadly force was not reasonable or justified, as there was no objectively reasonable fear of death or serious bodily harm.

4.    Mr. Pollow did not back Deputy Rosenthal into a situation in which Deputy Rosenthal had no place to go. The area around Deputy Rosenthal was open and unobstructed. Therefore, the use of deadly force was not reasonable or justified, as there was no objectively reasonable fear of death or serious bodily harm

5.    Deputy Rosenthal's un-holstering of his firearm while sitting in his car as Mr. Pollow was approaching his vehicle, and then exiting his car and pointing his firearm at Mr. Pollow set the series of events leading up to the shooting in motion.

6.     Physical evidence shows when and how Mr. Pollow was killed and how each bullet impacted his ability to move, continue his actions toward Deputy Rosenthal, or maintain a grip on a screwdriver.

7.     Deputy Rosenthal, as evidenced by his Internal Affairs file and Disciplinary file, has displayed a pattern of conduct that should have been investigated properly by PBSO. Had PBSO investigated and managed his prior behavior properly, he may have avoided using deadly force in the current situation.

8.     The Palm Beach County Sheriff's Office persistently failed to investigate deputy misconduct and failed to take proper disciplinary action against Deputies, including but not limited to Deputy Rosenthal, and thereby ratified police misconduct. Specifically, the failure of the Sheriff to properly investigate the numerous earlier shootings by its deputies and its uniform findings that all of the shootings were "good shoots" as well as never disciplining Deputy Rosenthal for his bad acts all led to an atmosphere of ratification.